UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**DANIEL O. CONWILL, IV**  **CIVIL ACTION**

**VERSUS**  **No. 09-4365**

**GREENBERG TRAURIG, L.L.P., ET AL.**  **SECTION I**

## ORDER AND REASONS

Before the Court are motions[1] for summary judgment filed by defendants, Greenberg Traurig, L.L.P. ("Greenberg") and Jay I. Gordon ("Gordon").  Plaintiff, Daniel O. Conwill, IV, opposes[2] the motion.  For the following reasons, defendants' motions for summary judgment are **GRANTED**.  Plaintiff's RICO claims are **DISMISSED WITH PREJUDICE** and plaintiff's remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

### *BACKGROUND*

In 2002, John Ohle ("Ohle")[3] approached plaintiff to offer personal financial planning services and participation in sophisticated tax planning strategies.[4]  Specifically, Ohle proposed a supposedly legal tax strategy (the "Transaction") through which plaintiff would be able to offset his income tax liability with claimed capital loss without actually suffering financial loss.[5]  Ohle represented that Greenberg would offer an independent analysis of the legitimacy and efficacy of

---

[1] R. Doc. Nos. 235, 239.
[2] R. Doc. No. 245.
[3] Ohle, also a defendant in this matter, has been defaulted, and the Court has denied his motion to set aside that default. See R. Doc. No. 140.
[4] R. Doc. No. 7, p.9.
[5] See also R. Doc. No. 235-3, p.39 ("He told me there was – there were some investment strategies that I could have a chance to make a little bit of money or a lot of money and that there would be tax deductions generated from the transactions.").

1

the proposed tax strategies.[6]  Plaintiff claims Ohle provided a draft legal opinion that Greenberg would deliver for the Transaction.[7]  Relying on that draft legal opinion, plaintiff decided to engage in the Transaction.[8]

On December 16, 2002, plaintiff established a trust with his wife as the trustee (the "Trust").[9]  Plaintiff retained David Lukinovich, an attorney, to draw up the documents to create the Trust.[10]  Plaintiff contributed $100,000 into the Trust, which then entered into a series of forward contracts and options contracts on December 18 and 19, 2002 involving foreign currencies—one "major currency" (the Euro) and one "minor currency" (the Danish Krone)—with a counterparty, Montgomery Global Advisors, LLC ("Montgomery").[11]  The Transaction generated a $9,095,850 loss, which plaintiff used to eliminate what would have been a $2.75 million federal income tax assessment to him for 2002.[12]

Montgomery, its affiliate, Groh Asset Management ("Groh"), and Ohle implemented the foreign currency trades.[13]  Plaintiff had no role in structuring or implementing the trades that constituted the Transaction.[14]  He exercised no control over the timing of the trades.[15]  He did not select the foreign currencies used or decide the amount of the options.[16]  He did not provide input into the termination dates or settlement dates of the trades.[17]  For their services in structuring and

---

[6] R. Doc. No. 245, p.4.
[7] R. Doc. No. 235-1, p.4.
[8] Id.; see also R. Doc. No. 245-1, p.36 ("I was induced by – the Greenberg name had a lot to do with me doing this transaction….I would not take a position, a tax position like this unless it was from a very large, very well regarded international law firm.").
[9] R. Doc. No. 245-1, p.28.
[10] Id.
[11] R. Doc. No. 235-1, 3-4.
[12] Id. at 4.
[13] Id. at 5.
[14] Id.
[15] Id.
[16] R. Doc. No. 235-1, p.5.
[17] Id.

implementing the Transaction, plaintiff paid Montgomery and Ohle $144,000 and $211,000, respectively.[18]

On October 10, 2003, Gordon, a shareholder of Greenberg, rendered a written opinion to plaintiff regarding the Transaction.[19] The opinion was based on factual representations by plaintiff.[20] The opinion concluded that any loss from the Transaction "more likely than not" would be allowable for U.S. income tax purposes.[21] After receiving Gordon's letter, plaintiff filed his tax return for 2002 on October 15, 2003.[22] Gordon now admits that he committed fraud in drafting and providing the opinion letter to plaintiff.[23]

In his complaint, plaintiff asserts that defendants committed "acts of deception which furthered the goal of soliciting clients to pay for participation in what the Enterprise knew or should have known was a fraudulent tax shelter transaction which would be deemed abusive by the IRS."[24] Plaintiff claims that the defendants' fraudulent and deceptive actions constituted wire fraud and mail fraud violations and that such actions are the predicate acts underlying his RICO claim.[25] Defendants have moved for partial summary judgment, arguing that plaintiff's RICO claim should be dismissed because it is: (1) barred under the Private Securities Litigation Reform Act ("PSLRA"); and (2) time-barred under the applicable four-year statute of limitations pursuant to the RICO statute.

---

[18] Id.
[19] R. Doc. No. 235-1, p.5.
[20] Id.
[21] Id. at pp.5-6.
[22] It at p.6.
[23] R. Doc. No. 245-2, pp.12-13.
[24] R. Doc. No. 1, p.11.
[25] Id. at p.12.

3

## *STANDARD OF LAW*

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. Celotex, 477 U.S. at 323; Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. at 255; see Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

*DISCUSSION*

The RICO statute provides a private right of action for a person harmed by a pattern of racketeering activity. 18 U.S.C. §§ 1962, 1964(c); Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P., 625 F.3d 185, 189 (5th Cir. 2010). "However, Congress limited this right by amending RICO in 1995, as part of the PSLRA, to bar civil RICO claims based on 'any conduct that would have been actionable as fraud in the purchase or sale of securities.'" Affco, 625 F.3d at 189 (quoting 18 U.S.C. § 1964(c)). "Accordingly, if the racketeering activity alleged to support a RICO claim is characterized by the plaintiffs as wire, mail, or bank fraud, but it also amounts to securities fraud, the claim must be dismissed." RA Investments I, LLC v. Deutsche Bank AG, 2005 WL 1356446, at *5 (N.D. Tex. June 6, 2005) (citing In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F.Supp.2d 511, 619).

Defendants contend that the predicate acts of mail and wire fraud in connection with the Transaction alleged by plaintiff are also actionable as fraud in the purchase or sale of securities in two manners: (1) the Transaction included the purchase or sale of investment contracts; and (2) plaintiff engaged in the Transaction in order to offset income derived from the exercise of his stock options on the public traded stock of Jefferies & Co., Inc. Because the Court finds that the Transaction included the purchase or sale of investment contracts, the Court does not address whether plaintiff's exercise of his stock options caused the alleged acts of fraud associated with the Transaction to be actionable as fraud in the purchase or sale of securities.[26]

**I.     Purchase or Sale of Investment Contracts.**

Plaintiff alleges that defendants "exceeded any legitimate role of diligent tax advisers by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of

---

[26] For the same reason, the Court also declines to address whether the four-year statute of limitations for RICO claims applies.

5

these tax strategies in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were likely not defensible to the IRS."[27] Since the underlying strategy in this case is the Transaction, the primary issue before the Court is whether the foreign currency trades involved in the Transaction are securities as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934.

As the Fifth Circuit has explained:

> Both the 1933 and 1934 Acts broadly define the term "security" to include, among other things, an "investment contract." See 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). In SEC v. W.J. Howey, Co., the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." 328 U.S. 293, 298-99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Howey test thus contains three elements: (1) an investment of money; (2) in a scheme functioning as a common enterprise; (3) with the expectation that profits will be derived solely from the efforts of individuals other than the investors. SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 477 (5th Cir. 1974) (citations omitted); accord Williamson v. Tucker, 645 F.2d 404, 417-18 (5th Cir. 1981) (citing Koscot, 497 F.2d 473).

Affco, 625 F.3d at 190.[28] "This definition embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." SEC. v. Edwards, 540 U.S. 389. 393 (2004).

The parties do not dispute that the Transaction included an investment of money.[29] Accordingly, the Court will proceed to determine whether the Transaction constituted a common enterprise, and whether the plaintiff was to receive profits solely from the efforts of others.

---

[27] R. Doc. No. 1, p.12.
[28] The court added that "[t]ax benefits may constitute an expectation of 'profits' under the Howey test." Affco, 625 F.3d at 190.
[29] R. Doc. 235-1, p.3 ("Conwill used the Trust to invest $100,000 in the Transaction"); R. Doc. No. 245-3, p.2.

*a. The Common Enterprise*

To determine whether a common enterprise has been established within the meaning of Howey, the Fifth Circuit has focused on the "vertical commonality" between the investors and the promoter. Long v. Shultz Cattle Co., Inc., 881 F.2d 129, 140 (5th Cir. 1989). While other circuits have taken a different approach, according to the Fifth Circuit:

> We have stated, in contrast, that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." [SEC v. Continental Commodities Corp., 497 F.2d 516, 522 (5th Cir. 1974)]. While our standard requires interdependence between the investors and the promoter, it does not define that interdependence narrowly in terms of shared profits or losses. Rather, the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise even where the promoter receives only a flat fee or commission rather than a share in the profits of the venture.

Id. at 140-41.

In Continental Commodities, the defendant "render[ed] investment counseling concerning which option on commodities futures to invest in, when to sell or exercise the option, and if the option is exercised, when to sell the specific futures contract." Continental Commodities, 497 F.2d at 522. In concluding that a common enterprise existed between defendant and investors, the Fifth Circuit observed that,

> Lacking the business acumen possessed by promoters, investors inexorably rely on Continental Commodities' guidance for the success of their investment. This guidance, like the efficacy of Koscot meetings and guidelines on recruiting prospects and consummating a sale, is uniformly extended to all its investors. That it may bear more productive fruits in the case of some options than it does in cases of others should not vitiate the essential fact that the success of the trading enterprise as a whole and customer investments individually is contingent upon the sagacious investment counseling of Continental Commodities.

Id. at 522-23.

In RA Investments, plaintiffs alleged that they were deceived into purchasing foreign exchange digital option contracts under the promise that purchasing the contracts would enable them to avoid income tax liability. 2005 WL 1356446, at * 5. After purchasing the digital option contracts, the defendants were tasked with execution of the contracts and determining when and if to trigger the options. Id. at *7. Presented with facts very similar to those in this case, including the promise and delivery of an independent legal opinion letter confirming the propriety of the proposed strategy, the court in RA Investments found that plaintiffs' fortunes were intertwined with the defendants' success in executing the digital option contracts. Id. Further, the court found that the plaintiffs relied on the defendants' expertise for the success of the transactions. Id. The court concluded that there was a common enterprise between the plaintiff investors and the defendants. Id.

Like the investors in RA Investments, plaintiff in this case had no role in structuring or implementing the trades that constituted the Transaction. He did not exercise control over the timing of the trades.[30] He did not select the foreign currencies used or decide the amount of the options.[31] He did not provide input into the termination dates or settlement dates of the trades.[32] He, himself, stated that "I just sent somebody money. They orchestrated the trades."[33] Further, he stated, "[a]gain, they were calling the shots on the trades, not me….It was a discretionary account."[34] Based on these admissions, it is apparent that the success of the transaction was

---

[30] R. Doc. No. 253-1, p.5.
[31] Id.
[32] Id.
[33] R. Doc. No. 235-3, p.60.
[34] Id. at 61.  Plaintiff cites Continental Commodities for the proposition that "[c]ourts are in general agreement that a particular commodities futures contract is not an investment contract." 497 F.2d 520 n.9; see R. Doc. No. 245, p.20. However, the court also held that "[i]t is important to be mindful of the distinction between trading on discretionary accounts and the actual commodities futures contract. Id.  As plaintiff has admitted, the Transaction was an investment in a discretionary account which, in turn, made use of particular futures contracts.  Therefore, the holding in Continental Commodities—that the common enterprise element can be met in circumstances of trading in discretionary commodities accounts—supports this Court's conclusion.

8

dependent on the expertise of Montgomery, Groh and Ohle.  Therefore, the Court concludes that the Transaction constituted a common enterprise.

    *b.  Solely From the Efforts of Others*

The 1933 and 1934 Securities Acts are remedial in nature. Koscot, 497 F.2d at 479.  "[I]n order to give effect to the remedial purposes of the Acts, substantive 'economic realities' must govern over form." Long, 881 F.2d at 133.  As the Fifth Circuit explains:

> Consequently, in order to ensure that the securities laws are not easily circumvented by agreements requiring a "modicum of effort" on the part of the investors, the word "solely" in the third prong of the Howey test has not been construed literally.  The "critical inquiry" is instead "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."

Id. (quoting Williamson v. Tucker, 645 F.2d 404, 418(5th Cir.), cert. denied, 454 U.S. 897 (1981)).

Defendants assert that the Transaction satisfies the third prong of the investment contract test.  Similar to their common enterprise argument, they rely on the fact that plaintiff had no control over the trading in his account.[35]  Plaintiff argues that the third prong is not satisfied because even though he relinquished control over the discrete tasks to effect the Transaction, he retained control over the ultimate decision to participate in the Transaction.  The Court finds plaintiff's argument unavailing.

In Affco, the Fifth Circuit was presented with a sophisticated income tax avoidance strategy in which taxpayers attempted to claim tax losses through a mechanism of offsetting digital options. Affco, 625 F.3d at 187.  There, the promoters created a limited liability company for the tax shelter and used it to generate tax losses through the purchase and sale of options. Id.

---

[35] The Fifth Circuit has recognized that under its standard, the second and third prong of the Howey test may overlap to a significant degree. See Long, 881 F.2d at 141.

at 188. The accounting firm of KPMG, LLP allegedly targeted and solicited the plaintiffs to participate in the tax shelter. Id. The law firm of Proskauer Rose, L.L.P. allegedly worked with KPMG and others to prepare, in advance, model opinions supporting the validity of the tax scheme. Id. Then, after consummation of the transaction, Sidley Austin Brown & Wood, LLP allegedly rendered opinions to the plaintiffs that the tax scheme "would likely pass muster with the IRS." Id.

The Fifth Circuit held that the plaintiffs' control over the tax shelter transaction "was theoretical rather than actual" because the plaintiffs had plead that the limited liability companies that were the investment vehicle for the tax shelter were "'under the direction of,' and 'managed by,' various investment consulting and brokerage entities for the purpose of implementing the tax scheme." Id. at 191. Since the plaintiffs "portrayed themselves as passive investors who depended—both in reality and according to their investment contracts—upon the efforts of others for their profits," the court found that the third prong of the investment contracts test had been satisfied. Id.

Like the investors in Affco and RA Investments, it was the trading decisions of parties other than the plaintiff in this case that were "the undeniably significant ones" in the Transaction. As noted earlier, plaintiff played no part in implementing the foreign currency options in the Transaction: he did not select the foreign currencies to use, he did not select the termination dates of the contracts, he did not determine the timing of the options, nor did he determine how many options would be employed.[36] He admitted that he ceded control of the details of the Transaction.[37] Therefore, it is apparent that plaintiff was dependent on the efforts of others to derive benefit from the Transaction.

---

[36] R. Doc. No. 235-3, pp.46-48.
[37] Id. at pp.61-62.

10

Plaintiff also argues that he "did not allow any of the investment advisors to direct or manage the trusts that were created by Mr. Lukinovich."[38] Even if plaintiff had retained some degree of control over the trusts themselves, plaintiff's argument is similarly unavailing. As the court in RA Investments stated, "[t]hat the plaintiffs themselves purchased the [digital options contracts] does not preclude finding that profits were to be derived through the efforts of others. Where, as in this case, investor actions are predicated solely on the promoter's advice and discretion, the third prong of the investment contract definition is satisfied." RA Investments, 2005 WL 1356446, at *8.

For the aforementioned reasons, the Court concludes that plaintiff's profits were to be derived solely from the efforts of others. The Court further concludes that, all three prongs of the investment contract test having been satisfied, the Transaction included the purchase or sale of securities.

## II. Actionable as Securities Fraud

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 reach any fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The Supreme Court has explained that the phrase "in connection with" in section 10(b) should "be construed not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes." SEC v. Zanford, 535 U.S. 813, 819 (2002). "All that is necessary to satisfy that requirement is proof of 'a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide.'" RA Investments, 2005 WL 1356446, at *9 (quoting Zanford, 535 U.S. at 825).

Although plaintiff has identified mail and wire fraud as the predicate acts supporting his RICO claim, these predicate acts are allegations of fraud in connection with, what the Court has

---

[38] R. Doc. No. 245, p.21.

11

now determined to be, the purchase or sale of securities. Plaintiff claims that false and misleading statements promising that he would be legally able to take tax deductions based on the losses generated in the Transaction misled him into entering into the Transaction. "Where, as here, the alleged fraud 'coincides' with the purchase of securities…and the purchase of securities is 'made to further [the defendants'] fraudulent scheme,'…the fraud is undeniably 'in connection with the purchase or sale of any security' and actionable under Section 10(b) and Rule 10b-5." RA Investments, 2005 WL 1356446, at *9 (quoting Zanford, 535 U.S. at 819, 820, 825).

Since the allegations of mail and wire fraud are actionable as securities fraud, plaintiff cannot rely on them as the basis for a RICO claim. See RA Investments, 2005 WL 1356446, at *11. Moreover, because plaintiff's RICO claim fails as a matter of law, its RICO conspiracy claim must also fail. See 18 U.S.C. § 1962(d) (requiring an underlying RICO violation to support a conspiracy claim); see also Manax v. McNamara, 842 F.2d 808, 812 (5th Cir. 1988) (holding that a claim under 18 U.S.C. § 1962(d) fails where allegations are insufficient to establish a violation under 1962(c)). Therefore, plaintiff's RICO claims are dismissed.

### III.     Supplemental Jurisdiction

Having dismissed plaintiff's federal claim before trial, the Court next considers whether to exercise supplemental jurisdiction over plaintiff's remaining state law claim for breach of fiduciary duty. See Cudd Pressure Control Inc. v. Roles, 328 Fed. Appx. 961, 966 n.2 (5th Cir. 2009) ("[T]he district court should keep in mind the Supreme Court's instructions that 'if the federal claims are dismissed before trial, … the state claims should be dismissed [or remanded] as well.'") (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)). "When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. However the dismissal should expressly be without prejudice so that the plaintiff may refile in

the appropriate state court." Bass v. Parkwood Hospital, 180 F.3d 234, 246 (5th Cir.1999). Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim. See 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); Severin v. Parish of Jefferson, 357 Fed. Appx. 601, 606 (5th Cir. 2009).

For the foregoing reasons,

**IT IS ORDERED** that the defendants' motions for summary judgment are **GRANTED** and plaintiff's RICO claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that plaintiff's remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, March 21, 2011.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**